762 A.2d 970

**In re DAVID S.**

**No. 2357, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Nov. 29, 2000.

John Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Ann Ince, Asst. Atty. General (J. Joseph Curran, Atty. General, Jason F. Trumpbour, Staff Attorney, Baltimore, and Douglas Gansler, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Submitted before SONNER, WENNER,* and THIEME,* JJ.

SONNER, Judge.

The District Court of Maryland for Montgomery County, sitting as a Juvenile Court, found appellant, David S., to be involved in the crime of possession of cocaine with intent to distribute. The court adjudicated David delinquent and placed him on probation, in the custody of his mother. He raises the following questions for our review:

I. Did the trial judge err in denying appellant's motion to suppress cocaine that was illegally seized?

II. Did the trial judge err in refusing to allow defense counsel to establish at the suppression hearing that the seizing officer knew the object he grabbed was not a handgun as soon as he touched it?

We resolve the first issue in David's favor and, accordingly, reverse. We do not reach the second issue.

---

* Wenner and Thieme, JJ. participated in the hearing and conference of this case while active members of this Court; they participated in the adoption of this opinion as retired, specially assigned members of this Court.

On the evening of March 30, 1999, Corporal Rich Segalman, a twelve-year veteran of the Rockville City Police Department, observed a house on Moore Drive, the site of what the police maintain was an open air drug market. At about 8:00 p.m., Cpl. Segalman saw what he believed to be a drug transaction between Pedro Hall, a known drug dealer, and another man. At about 8:30 p.m., Cpl. Segalman observed Hall and David S. near an abandoned transformer building, which had been boarded up for several months. David walked behind the building, while Hall stood lookout. A few minutes later, David emerged, pulled an object from his pocket, and showed it to Hall. Next, David stuffed the object into the front waistband of his pants. At the suppression hearing, Cpl. Segalman testified that, based on his extensive experiences with drug arrests and training in narcotics, he believed David stuffed a handgun into his waistband.

As they began to walk back toward Moore Drive, Cpl. Segalman radioed to other officers to stop them. Corporal Segalman then came to where they were stopped, placed them on the ground in the prone position, and handcuffed them. He rolled David over onto his back, touched the area of David's waistband, and felt a hard object. Believing the object was a gun, Cpl. Segalman pulled out David's tucked-in shirt and observed a black object protruding from his waistband, confirming his belief that the object was a handgun. He removed the object from David's waistband, noted that it was wrapped in a black plastic bag, opened the bag, and found cocaine. David S. argues that the stop, frisk, and ultimate search and seizure of the contents of the black plastic bag violated the Fourth Amendment and, thus, any fruits of the unconstitutional search must be suppressed.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. XIV. The

amendment protects a person's reasonable "expectation of privacy." *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citing *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). A search that is reasonable in its inception may turn violative of the Fourth Amendment through its intensity and scope. *Terry,* 392 U.S. at 18, 88 S.Ct. 1868. As Justice Fortas wrote, the scope of a search "must be tied to and justified by" the circumstances that rendered its initiation permissible. *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)(Fortas, J., concurring).

 In *Terry,* the Supreme Court held that, even without probable cause, a police officer can stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion, supported by articulable facts, that criminal activity "may be afoot." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). An officer making a *Terry* stop must furnish more than an "inchoate and unparticulatized suspicion or hunch." *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (citing *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). Indeed, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In evaluating the existence of reasonable suspicion, courts consider "the totality of the circumstances—the whole picture." *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581 (citing *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

 In the instant case, Cpl. Segalman gave two bases for stopping David. Initially, he was suspicious of David because he was associating with Hall, who the officer had recently observed in a drug sale. A person's presence with a recognized drug source, however, is not enough to support a reasonable and articulable suspicion that criminality is afoot.

*Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("The inference that persons who talk to narcotics addicts [or dealers] are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security."); *In Re Appeal No. 113*, 23 Md.App. 255, 260, 326 A.2d 754 (1974). Corporal Segalman also stated that he suspected Hall and David of burglarizing, or attempting to burglarize, the abandoned transformer building. In its brief, the State emphasized that, at the time of the burglary, it was dark, the building was vacant, and Hall appeared to stand lookout as David disappeared behind the building for several minutes. We agree that such articulated circumstances could amount to reasonable suspicion and legitimize a *Terry* stop of David S.

"Although a reasonable 'stop' is a necessary predecessor to a reasonable 'frisk,' a reasonable 'frisk' does not inevitably follow in the wake of every reasonable 'stop.'" *Gibbs v. State*, 18 Md.App. 230, 238–39, 306 A.2d 587 (1973). Turning to the frisk, we are once again guided by *Terry* and its progeny. "[W]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon." *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (citing *Terry*, 392 U.S. at 24, 88 S.Ct. 1868). Because "the purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the search must be confined to finding weapons that might place the officer or the public in danger. *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130 (citing *Terry*, 392 U.S. at 26, 88 S.Ct. 1868); *State v. Smith*, 345 Md. 460, 465, 693 A.2d 749 (1997).

In *Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), decided the same day as *Terry*,

the Supreme Court overturned Sibron's heroin conviction be-
cause the search that led to the drugs was not premised on
probable cause, and it went beyond the protective frisk sanc-
tioned in *Terry*. The apprehending officer observed Sibron
conversing with known heroin addicts throughout an eight-
hour period. He then approached Sibron, told him, "You
know what I am after," and thrust his hand into Sibron's
pocket, locating the drugs. In overturning the conviction, the
Court stated:

> The police officer is not entitled to seize and search every
> person whom he sees on the street or of whom he makes
> inquiries. Before he places a hand on the person of a
> citizen in search of anything, he must have constitutionally
> adequate, reasonable grounds for doing so. In the case of
> the self-protective search for weapons, he must be able to
> point to particular facts from which he reasonably inferred
> that the individual was armed and dangerous.

*Sibron*, 392 U.S. at 64, 88 S.Ct. 1889 (citing *Terry*, 392 U.S. 1,
88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Here, Cpl. Segalman's
conduct ran afoul of the frisk proscriptions enumerated in
*Terry* and *Sibron*. The State argues that Cpl. Segalman was
"reasonably certain that the object in David's waistband was
either a gun or illegal substances." A *Terry* frisk, however,
cannot be performed to discover evidence. *Smith*, 345 Md. at
465, 693 A.2d 749. The State further argues that, since Cpl.
Segalman was not sure whether the black bag contained a
weapon, he was entitled to inspect the inside of the bag to
completely allay his suspicion. "[T]he right to conduct a
*Terry* [frisk, however,] does not give the police the right to
make absolutely sure that no weapon is present." *Id.* at 471,
693 A.2d 749 (quoting *Aguilar v. State*, 88 Md.App. 276, 286,
594 A.2d 1167 (1991)). Under the circumstances, Cpl. Segal-
man would have been justified to subject David to a pat-down.
To order him to the ground and place him in handcuffs,
however, required probable cause, which the officer failed to
demonstrate. Corporal Segalman then took the more intru-
sive steps of lifting David's shirt to expose the black bag and
exploring the contents of the bag. As in *Sibron*, he clearly

overstepped the boundary of a "strictly circumscribed" search. *Terry*, 392 U.S. at 26, 88 S.Ct. 1868.

Were we to permit Cpl. Segalman to confirm only a suspicion that the suspect was in possession of contraband by searching the suspect incident to a stop in which the suspect is laid prone, handcuffed, and searched for weapons, we would be extending *Terry* far beyond its original rationale. We are "sensitive to the danger ... that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130 (citing *Texas v. Brown*, 460 U.S. 730, 748, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring)). The law enforcement community must read *Terry*'s exception of warrantless stops and frisks in tandem with *Sibron*'s bridled application of that exception.

**JUDGMENT REVERSED; CASE REMANDED TO THE JUVENILE COURT OF MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY.**